Jeff RICE and Tammy Rice,
Appellants–Petitioners,

v.

ALLEN COUNTY PLAN COMMIS-
SION, Appellee–Respondent.

No. 02A03–0510–CV–519.

Court of Appeals of Indiana.

Aug. 15, 2006.

James A. Federoff, Jason M. Kuchmay, Federoff Law Firm, LLP, Fort Wayne, IN, Attorneys for Appellants.

Robert W. Eherenman, Haller & Colvin, P.C., Fort Wayne, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellants-petitioners Jeff and Tammy Rice appeal from the trial court's order affirming the decision of appellee-respondent Allen County Plan Commission (the Commission) to conditionally approve the Rices' primary development plan (Development Plan) as to their proposed home, but not to their already-constructed garage. The Rices raise a number of arguments, one of which we find dispositive: whether the Commission's decision was unsupported by substantial evidence. Finding that there is not substantial evidence supporting the Commission's decision, we reverse and remand with instructions to remand this cause to the Commission with instructions to approve the Development Plan unconditionally with respect to the home and the garage.

## FACTS

The Rices own a 3.656–acre parcel of real estate (the Real Estate) in Allen County. The Real Estate is adjacent to the southern border of the West Autumn subdivision (West Autumn), but the Real Estate is not part of West Autumn, having been purposely excluded by West Autumn's developer during the platting process.

The Real Estate is located in an RSP–1/Planned Single Family Residential zoning district, which means that the Rices are required to have a development plan approved—absent an approved waiver—by the Commission to construct their home and garage. Accordingly, on August 29, 2003, the Rices applied for a waiver of the development plan requirements, which was granted on September 3, 2003. In granting the waiver, the Zoning Administrator found that the Rices' proposed use of the land—the home and the garage—would not have a significant impact upon adjacent land uses, the street system, utilities, and storm drainage facilities that serve the Real Estate. The Zoning Administrator also found that requiring the submission of a development plan for a single-family use would not serve the public convenience and welfare.

At the same time they sought the waiver, the Rices also applied for an Improvement Location Permit (ILP) to construct the home and the garage, which were both depicted on the Rices' site plan submitted with the ILP application. On September 4, 2003, the Zoning Administrator issued the ILP. In January 2004, the Rices were working with a builder to complete the final plans and contract to construct the home. They planned to commence construction of the home, which they anticipated would be completed within six months, in March.

On March 10, 2004, Jeff spoke with Larry Weber, of the Allen County Surveyor's Office (ACSO), and learned that some of the West Autumn residents were upset because they believed that the West Autumn developer should not have sold the Real Estate to the Rices. The residents believed that the Real Estate was supposed to be—and remain—an undeveloped West Autumn common area.

Additionally, Weber informed Jeff that there was a potential problem related to a bridge that Allen County was planning to construct on Old Auburn Road. Specifically, Weber believed that, if the bridge was constructed as planned, the Rices would not be able to use their driveway, which exits onto Old Auburn Road. On March 25, 2004, Jeff met with Mike Fitch, the Executive Director of the Allen County Highway

Department (ACHD), and explained the potential problem surrounding the bridge construction. Fitch indicated to Jeff that he would look into the problem and that Allen County had other possible options with respect to the construction of the bridge.

The next day, Jeff went to the Department of Planning Services (DPS), which is the planning and zoning staff of Allen County, to discuss the bridge construction. A DPS employee named Kevin advised Jeff that the Rices could either begin construction of the home or could revise the plans and build an apartment inside the garage for the time being. Kevin further advised Jeff that the Rices would have to live inside the apartment for one year, and afterwards, could then apply for a new permit to build the home. Given the uncertainty surrounding the bridge construction, the Rices concluded that temporarily building the apartment was the best way to proceed.

Subsequently, the Rices filed documents to obtain an amended ILP, depicting the garage as containing 672 square feet of living space.[1] DPS issued a revised ILP on March 25, 2004.[2] On April 1, 2004, Jeff went to the Building Department and applied for building permits to construct the apartment inside of the garage.

Pursuant to section 3–13–1–5 of the Zoning Ordinance, an ILP "may be revoked if active work is not commenced within sixty days after the date of its issuance...." Appellant's App. p. 197. On May 25, 2004,

sixty-one days after the Rices' amended ILP—to construct the garage with the temporary apartment—was issued, the Commission notified the Rices that effective on May 26, the previously-issued waiver was revoked. Consequently, the Rices had until June 3, 2004, to apply for development plan approval. At the time of the waiver revocation, the Rices had already completed construction of the garage pursuant to the original ILP, and work on the temporary apartment, pursuant to the amended ILP, was progressing. The Commission contends that it revoked the waiver because it learned that Rice had neither applied for nor received plumbing and heating permits or other required county approvals for the living space in the garage.

On June 3, 2004, the Rices filed their Development Plan, which included the existing garage and the not-yet-constructed home, for approval. By that time, the Rices had over $100,000 invested in the Real Estate, the construction of the garage, the driveway, and excavating and survey work. On June 10, 2004, the Allen County Drainage Board approved the Rices' drainage plans related to the Development Plan.

On June 25, 2004, the President of the West Autumn Homeowner's Association submitted a letter and petition objecting to the Development Plan. The crux of the Association's objection to the proposed construction was that the West Autumn

---

1. Pursuant to section 3–6–1–2 of the Zoning Ordinance, in an RSP–1 zone, a detached building—such as the Rices' garage—is not permitted as a primary use; rather, it is an accessory use, which is a building or use subordinate to another structure or use located on the same lot. With no residence constructed on the Real Estate, the garage was in violation of the ordinance. Thus, adding 672 square feet of living space to the garage en-

abled it to become a permissible primary use as a dwelling.

2. After the revised ILP was issued, the Rices no longer had a valid permit to construct the home. Hence, they intended to follow Kevin's advice by completing construction of the garage and living space, waiting for a period of time, and then seeking a new ILP for construction of the home.

Developer had allegedly promised the West Autumn residents that the Real Estate would be common area owned by the Association, and would remain undeveloped.

On June 30, 2004, Fitch and Michael C. Eckert, Manager of Technical Services, wrote to the Commission to relate that the ACHD had "[n]o apparent conflicts" with the Rices' Development Plan. Appellants' App. p. 219–21. On July 6, 2004, the Rices' engineering and surveying consultant sent a letter to the ACSO confirming that the Development Plan would meet all ACSO requirements. On July 7, 2004, the City of Fort Wayne Water Resources Development Services advised DPS that it did not object to the Development Plan.

On July 8, 2004, the Commission held a public hearing on the Rices' Development Plan. At the public hearing, the Rices presented and explained the Development Plan, and established its alleged compliance with the Zoning Ordinance. As to the compatibility of the detached garage with surrounding land uses, the Rices presented the following evidence: the garage is lower in elevation than a typical two-story house and is earth-tone in color, which is compatible with residences in the area, Appellants' App. p. 41; the Rices proposed to plant evergreen trees along the north side of the garage and the driveway to act as a buffer to the West Autumn Homes, *id.* p. 43; the primary purpose of the garage was to store the Rices' motor home, *id.* p. 41; within a 3/4–mile radius of the Real Estate, there are a number of detached structures and outbuildings similar to the garage, although West Autumn admittedly prohibits such structures, *id.* p. 45, 237, 279.

In response to West Autumn residents' suspicions that the Rices never intended to build the home, they presented the following evidence: they were under contract with Aspen Bay, a home builder, who was prepared to begin construction as soon as the necessary approvals and permits were obtained or issued, *id.* p. 41–42; the initial cause for delay in construction of the home—the bridge—was no longer an issue because ACHD had assured the Rices that driveway access to Old Auburn Road would not be impacted by the planned construction of the bridge, *id.* p. 42, 49; Eckert testified on behalf of ACHD at the public hearing that "[w]e have issued the permit and we will make allowance for [the Rices' project] with the design of Auburn Road." *Id.* p. 49.

The remonstrators presented the following evidence in opposition to approval of the Development Plan: a number of West Auburn residents opposed the construction because their developer had allegedly promised them that the Real Estate would remain undeveloped common area, *id.* p. 54, 59; a number of neighbors of the Real Estate had suspicions that the Rices were using the garage for commercial purposes because they had observed trucks entering and exiting the garage and a hot tub being stored in the garage, *id.* p. 63(a); and a West Auburn resident presented an appraisal of his property that allegedly reveals a reduction in his property value, presumably as a result of the Rices' garage, *id.* p. 58(a), 64, 247. In response, the Rices emphasized the following: any promises made to West Auburn residents by the developer are irrelevant, inasmuch as the Rices, not the developer, owned the Real Estate at the time they submitted the Development Plan; the trucks entering and exiting the garage were involved in the construction and interior work on the structure; and the appraisal actually shows an increase, not a decrease, in the particular resident's West Auburn residence.

On July 27, 2004, the Commission approved the Development Plan with respect to the home, but imposed a number of conditions, including the following: the Rices must execute a written commitment containing the provisions and restrictions of the West Auburn covenants. The Commission denied the Development Plan with respect to the garage.

On August 24, 2004, the Rices filed a petition for the trial court to review the Commission's decision, seeking an order reversing the decision and approving the Development Plan as submitted by the Rices without any conditions. The Rices filed a motion for summary judgment on May 27, 2005, and the Commission filed a cross-motion for summary judgment on July 1, 2005. Following oral argument, the trial court entered an order granting summary judgment in favor of the Commission on September 30, 2005, finding, among other things, as follows:

> ... [the Rices'] failure to take any action (an appeal or otherwise) in response to [the Commission's] Zoning Administrator's May 25, 2004 determination to revoke the previously-issued administrative waiver renders the prior acts of both parties irrelevant for purposes of the Court's disposition of the question.

\* \* \*

In its decision, [the Commission] found that [the Rices'] development plan with respect to the garage did not meet the Allen County Zoning Ordinance's criteria because the garage would be used for vehicles that would be unrelated to single family use and that the size of these vehicles, along with the property access onto Old Auburn Road, would create an issue of road safety. The record indicates evidence pertaining to this determination was presented by the

[ACHD] and testimony given regarding large vehicles entering and leaving the real estate and use of the real estate for non-residential properties. The record reflects evidence that the garage did not maintain the role and character of the neighborhood and was not compatible to the surrounding area, that the garage was used for commercial purposes, and that the garage impacted surrounding land values.... The Court finds that the evidence cited by [the Commission] in support of its decision meets the "substantial" test ... as set forth above.

\* \* \*

... the Court is forced to confront the almost artificial reality of reviewing a Plan Commission decision meant (in the vast majority of cases) to be made in the abstract (i.e. pre-construction) instead of with an already-completed structure. Concepts of equity and equitable estoppel weigh more heavily in [the Rices'] favor, as both parties recognize (as does the Court) that the approval of the decision to impose the West Autumn sub-division provisions and restrictions may necessarily result in the removal of the garage.... As discussed above, the Court must limit its review in law to the series of events beginning with [the Rices'] June 3, 2004 filing of their development plan for approval. [The Commission's] act was legally sound, presumptively correct and met the conditions set forth by both parties as identified in *Metropolitan Development Commission v. Schroeder* (Ind.App.2000) 727 N.E.2d 742.

... in the artificial reality the Court finds itself in review of this decision, Petitioners' argument must fail as illtimed. In its examination of the entire Record of Proceedings in this case, including the timeline of events, the Court

could find itself more likely to preferentially consider Petitioners' equitable estoppel argument if it was presented as a part of an appeal of [the Commission's] Zoning Administrator's revocation of [the Rices'] waiver in May, 2004 (not as a part of the appeal of the decision on the development plan). The Court must find that [the Commission's] decision to conditionally approve [the Rices'] development plan with a written commitment was proper.

Appellants' App. p. 23–31. The Rices now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

▪ In reviewing an agency decision, we may provide relief only if the decision is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Equicor Dev., Inc. v. Westfield–Washington Twp. Plan Comm'n,* 758 N.E.2d 34, 36 (Ind.2001). An administrative act is arbitrary and capricious only where it is willful and unreasonable, without consideration and in disregard of the facts and circumstances of the case, or without some basis that would lead a reasonable and honest person to the same conclusion. *Id.* at 37. Additionally, in the context of zoning proceedings, evidence is substantial "if it is more than a scintilla and less than a preponderance." *S & S Enters., Inc. v. Marion County Bd. of Zoning Appeals,* 788 N.E.2d 485, 491 (Ind.Ct.App.2003). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* Additionally, it must be more than speculation and conjecture. *Ind. Alcoholic Beverage Comm'n v. River Road Lounge, Inc.,* 590 N.E.2d 656, 659 (Ind.Ct.App.1992).

▪ On appeal, where, as here, the trial court's factual findings were based on a paper record, we conduct a de novo review of the record. *Equicor,* 758 N.E.2d at 37. But in reviewing an administrative decision, a court is not to try the facts de novo or substitute its own judgment for that of the agency. *Id.* We presume that the zoning board's decision is correct, and the decision will not be overturned unless it is arbitrary, capricious, or an abuse of discretion. *Plan Comm'n for Floyd County v. Klein,* 765 N.E.2d 632, 642 (Ind.Ct. App.2002).

▪ The burden of demonstrating the invalidity of the agency action is on the party asserting invalidity. *Equicor,* 758 N.E.2d at 37. To that end, the party asserting invalidity must establish as a matter of law that each criterion for approval of a zoning application has been fulfilled. *Town of Beverly Shores v. Bagnall,* 590 N.E.2d 1059, 1061 (Ind.1992).

### II. Substantial Evidence

The Rices assert that there is not substantial evidence supporting the Commission's conditional approval of their Development Plan. The Commission responds by emphasizing that it is the Rices' burden to establish that their Development Plan meets the criteria in the Allen County Zoning Ordinance, which requires that to approve of a development plan, the Commission must determine that it:

(1) meets the design standards imposed by this Ordinance;

(2) satisfies the stated purposes set forth in I.C. 36–7–4–601(c);

(3) complies with the stated goals and purposes of the Allen County Comprehensive Plan A.C.C. 2–3;

(4) adequately satisfies the following general development standards:

 (A) compatibility with surrounding land uses;

 (B) availability and coordination of sewer, water, storm drainage and utility services or facilities;

 (C) allocation of appropriate areas for streets, parks, recreational facilities and schools, if necessary; and,

 (D) appropriate building separation, vehicular circulation, parking, site improvements and signage; and

(5) provides for a distribution of traffic in a manner which creates conditions favorable to the health, safety, convenience and harmonious development of the community, particularly considering the following factors:

 (A) the design and location of proposed street and highway access points for the purpose of minimizing safety hazards and congestion;

 (B) the capacity of adjacent existing streets and highways to safely and efficiently handle traffic projected to be generated by the development; and,

 (C) the coordination of the streets and entrances in the development plan with existing and planned streets and highways.

Appellants' App. p. 180–81. The Commission found that the proposed home met all of the criteria. As to the garage, the Commission found that it met the design standards imposed by the zoning ordinance but that it did not meet any of the remaining criteria. Essentially, the Commission concluded that the garage failed to meet the remaining criteria for three basic reasons: (1) the garage was being used for impermissible commercial purposes rather than for single-family residential purposes; (2) the large vehicles used in the garage create hazardous traffic safety conditions with respect to ingress and egress from the driveway; and (3) the garage is incompatible with surrounding land uses because the Real Estate was originally intended to be part of West Autumn and subject to the restrictive covenants of that subdivision, because the garage does not maintain the role and character of the surrounding area, and because the garage adversely affects property values.

### A. "Commercial" Use

Turning first to the Commission's conclusion that the Rices were using the garage for impermissible "commercial" purposes, we observe that neither the Commission nor the evidence supporting this conclusion define the term "commercial." The accepted definition of "commercial" is: "Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce." Black's Law Dictionary 270 (6th ed.1990). "Commerce" is defined as "[t]he exchange of goods, productions, or property of any kind; the buying, selling, and exchanging of articles." *Id.* at 269.

Initially, we note that there is no evidence anywhere in the record that the Rices have ever used the garage to conduct any sort of commerce. No one has ever posited that the garage was being used to buy, sell, or exchange goods, productions, property, or articles of any kind. Consequently, there is unquestionably less than a scintilla of evidence supporting this conclusion.

In arriving at the conclusion that the Rices were using the garage for impermissible "commercial" purposes, the Commission based its conclusion *solely* on the size of the garage and a series of comments

made at the public hearing by West Autumn residents, all of which are similar to the following:

- "I have seen huge trucks come in there. I couldn't tell what was on them, or what they were doing there." Appellants' App. p. 55–56.

- "... I had a barn that big on a farm that I sold a few years ago, and I could park 22 cars in that barn. I didn't, but I figured out square footage that way. There's no way that, in my opinion, you can call that anything but a commercial structure." *Id.* p. 57.

- "It's—it's the size of it. It—I mean, a standard garage just isn't this size. The only time you see a building this size is for commercial application. I'm sorry if this is a false accusation, but in peoples' eyes that have to view this every day, this is what we—the first thing that comes to mind. I don't know anybody that's ever called it a garage." *Id.* p. 58.

Essentially, the only evidence supporting the conclusion that the garage was being used for impermissible "commercial" purposes were the layperson observations offered by West Autumn residents—who were opposed to the construction all along—who testified that they had seen a number of large trucks entering and exiting the garage and that there was a hot tub being stored in the structure.

The Rices, on the other hand, offered evidence that all of the large vehicles that were entering and exiting the Real Estate were involved in the construction and interior work on the garage. Appellants' App. p. 63(a). Moreover, the hot tub that was delivered to the garage was being stored there until the completion of the construction of the home, at which time the hot tub will be installed in the home. *Id.*

Additionally, we note that all of the evidence relied upon by the Commission relates to the Rices' prior use of the garage. The evidence in the record is undisputed regarding the Rices' future plans for the structure: the only vehicles that the Rices will use on the Real Estate and store in the garage are their personal vehicles and a motor home. That is the only use for which their Development Plan sought approval, and there is no evidence in the record establishing that any future use of the garage will run afoul of the zoning ordinance.[3]

In sum, there is no evidence in the record that the Rices have ever used the garage to conduct commerce. The only evidence in the record tending to support the Commission's conclusion regarding the Rices' past use of the garage consists solely of arguably unreliable statements made by West Auburn residents. The only evidence in the record regarding the Rices' plans for future use of the garage establishes that they will use it for their own personal vehicles and storage of their motor home, which are permissible uses pursuant to the zoning ordinance. Based on this record, we cannot conclude that a reasonable mind might accept this evidence as adequate to support a conclusion that the Rices will use their garage for impermissible "commercial" purposes. To the contrary, the only evidence supporting that conclusion is arguably irrelevant inasmuch as it focuses on past conduct and is no more than speculation and conjecture. Consequently, we are compelled to conclude that there is not substantial evidence supporting this conclusion. Moreover, to

---

**3.** As an aside, we note that if, after the Rices complete their construction, they use their Real Estate in violation of the zoning ordinance, the Zoning Administrator can initiate enforcement proceedings.

the extent that the Commission determined that the purported "commercial" purpose of the garage affected the Rices' ability to satisfy several of the relevant zoning criteria, we conclude that the Rices have established their compliance with those criteria as a matter of law.

### B. Traffic Safety

 The next way in which the Commission concluded the garage runs afoul of the zoning criteria relates to traffic safety. Specifically, the Commission found that the large vehicles that would be entering and exiting the property created hazardous conditions with respect to ingress and egress from the driveway.

Initially, we note that we have already concluded that there is no support in the record for a conclusion that, after construction is completed, there will be any vehicles, large or otherwise, regularly entering and exiting the Real Estate except for the Rices' personal vehicles and motor home. Thus, the record does not support the assumption underlying this conclusion. To the extent, therefore, that this conclusion rested on the Commission's determination that "the traffic coming and leaving the Real Estate should be limited only to the Residence," together with its concern "related to the fact that Rice had previously used the [garage] for large truck traffic and for commercial purposes," Appellee's Br. p. 20, it is not supported by substantial evidence.

To the extent that the Commission's concern about large vehicles relates to the Rices' motor home,[4] we turn to the following evidence relied upon by the Commission in arriving at its conclusion regarding traffic safety. It relied upon testimony

from a West Autumn resident who had difficulty exiting her own driveway with a four-door truck but did not testify that she had ever been on—or exited from—the Real Estate. Moreover, she conceded that she can safely pull out of her driveway if she waits until traffic clears in both directions, and her husband admitted that he was certain that a vehicle could exit the Rices' driveway and stay in the appropriate lane. Additionally, another neighbor testified that he had never seen a driveway as close as the Rices' is to a bridge, and that he believed that the location would create safety problems.

On the other hand, the Rices presented evidence regarding the traffic safety of their Development Plan. The Rices established that they had approval from the Highway Department for their driveway access. Moreover, the Highway Department had assured the Rices that any future construction of the bridge on Old Auburn Road would accommodate the Rices' access. At the public hearing, the Highway Department representative commented that the department had "no apparent conflicts" with the Development Plan. Appellants' App. p. 49. Additionally, the Executive Director of the Highway Department testified that although the driveway's location is not ideal, he did not believe there would be a blind spot. *Id.* p. 65.

Thus, the only evidence in the record from any government officials, specifically, employees of the Highway Department, establishes that there are no traffic concerns, safety or otherwise, with respect to the Rices' driveway. And the only evidence in the record supporting the Commission's conclusion that a motor home

---

4. We note our skepticism that this conclusion rested on the motor home, inasmuch as the Commission expressed concern only with respect to the "commercial" traffic on the Real Estate. Giving the Commission the benefit of the doubt, however, we will analyze the conclusion with respect to the motor home.

exiting the Real Estate would cause safety hazards is testimony from West Auburn neighbors who had never been on the Real Estate or attempted to drive a motor home onto or off of the Real Estate. Therefore, we are again compelled to conclude that there is not substantial evidence supporting the Commission's determination that the Real Estate presented any traffic safety problems. Furthermore, we conclude that the Rices have established their compliance with the traffic safety zoning criterion as a matter of law.

### C. Compatibility with Surrounding Land Uses

■ Finally, the Commission concluded that the garage does not comply with the zoning ordinance criteria because it is incompatible with surrounding land uses. Specifically, the Commission found that the Real Estate was originally intended to be part of West Autumn and subject to the restrictive covenants of that subdivision, the garage does not maintain the role and character of the surrounding area, and the garage adversely affects property values.

The Commission described the first reason it concluded that the garage is incompatible with surrounding land uses as follows:

The surrounding land uses consist mainly of platted residential lots that are restricted by plat covenants. In fact, when the Real Estate was rezoned, it was originally intended that upon the approval of the primary plat, the restrictive covenants would be applied to and recorded against the Real Estate. The Real Estate was originally part of the common scheme and development of the primary plat of West Autumn; however, when the Real Estate was excluded from the recorded secondary plats, the restrictions on the platted lots in West Autumn were omitted from the conveyance of the Real Estate from the developer to the Applicant.

Appellants' App. p. 20. The intent of the West Autumn developer is entirely irrelevant to the approval of the Development Plan. So, too, are any promises the developer may have made to the West Autumn residents regarding the intended use of the Real Estate.[5] Instead, what matters are the terms of the Rices' purchase of the Real Estate. To that end, we emphasize that when the Rices lawfully purchased the Real Estate, it was not subject to any restrictive covenants. For our purposes, the story begins there. Thus, we conclude that the Commission erred in relying on the alleged original plan for the use of the Real Estate.

The next determination made by the Commission with respect to compatibility was that the garage did not maintain the role and character of the surrounding land area. Specifically, a number of West Auburn residents complained that the garage has adversely affected the view from their property. Additionally, West Auburn residents complained that in their subdivision, they are not permitted to have a detached garage pursuant to their restrictive covenants. Many of the residents based their complaints on an understanding that the garage was a commercial structure.

On the other hand, although the Rices concede that West Auburn residents are not permitted to have detached structures such as the garage, they presented evidence that within a 3/4–mile radius of the Real Estate, there were a number of detached structures and outbuildings similar

---

**5.** The West Autumn residents must take that issue up with the developer. The Rices have no part in that dispute.

to the garage. Additionally, they presented evidence that the garage was visibly compatible with and maintained the role and character of the neighborhood, inasmuch as it was lower in elevation than a typical two-story house and earth-toned in color. Moreover, to buffer the West Autumn homes, the Rices proposed to plant evergreen trees along the north side of the garage and the driveway.

Thus, the Rices presented evidence establishing that the garage was visually compatible with the surrounding area, that although it did not comply with the West Autumn restrictive covenant there were other similar detached structures within a 3/4–mile radius of the Real Estate and that the Rices planned to plant evergreen trees as a buffer to the West Autumn subdivision. On the other hand, the only evidence supporting the Commission's conclusion was testimony from West Autumn residents who complained about their view and about the fact that they were not permitted to have similar structures on their property.

The Commission makes much of the fact that the garage does not comply with the West Autumn restrictive covenants; but again, we emphasize that the Real Estate *is not subject to* those covenants. As aptly put by the Rices, "[t]he Zoning Ordinance directs the Plan Commission to ascertain whether the Garage is *compatible* with surrounding land uses; the Zoning Ordinance does not require that surrounding land uses be identical, nor does it require that the Garage be a permitted structure in a neighboring development." [6] Reply Br. p. 7 (emphasis in original). And al-

though similarity to the surrounding properties is a fair consideration in terms of compatibility, there is no evidence in the record that the Commission considered any other surrounding land areas aside from West Autumn. While West Autumn may be an important factor, it is improper to turn a blind eye to the fact that the Real Estate only borders West Autumn on one side and that there are other properties in the near vicinity that have detached structures that are similar to the garage. Under these circumstances, we must conclude that there was not substantial evidence supporting a conclusion that the garage was incompatible with surrounding land uses.

Finally, the Commission concluded that the garage was having a "significant [detrimental] impact on land values of adjacent residences." Appellants' App. p. 20. In arriving at this conclusion, the Commission relied on testimony from West Auburn residents who were of the opinion that the value of their property had decreased since the garage was constructed and on one appraisal that the Commission concludes establishes a decline in value to the house or $28,644 or 13.2% "because of the commercial structure." Appellee's Br. p. 15. As to the residents' opinions, we observe that aside from the lone appraisal, none of the opinions were based on any facts; rather, they were based on opinions such as the following: the president of the homeowners' association testified that he looked at a lot from which you can see the garage and "will not pay that kind of money for that

---

**6.** The Commission argues that because Rice did not present evidence about what zoning restrictions regulated the other properties in the area that have detached structures, his evidence regarding such properties is not useful. But as we have already noted, the Rices do not need to prove that their use of the Real Estate is identical to surrounding land uses, only that it is compatible. Thus, the zoning restrictions placed on surrounding properties is of no moment, inasmuch as they are surrounding lands containing structures similar to the garage.

view." Appellee's App. p. 77. Another resident testified that he believed that the garage has "impacted the property values of several hundred houses...." Appellee's App. p. 116.

Turning to the appraisal, frankly, we are perplexed as to the Commission's conclusion that it shows a decline in value to the house. The first page of the exhibit does, indeed, say "Loss of Property Value: $28,644 ... $217,000 appraised value × 13.2% loss percentage = $28,644." Appellants' App. p. 243. But this page does not appear to have been created by the appraiser; to the contrary, the official "Appraisal" begins on the following page, and indicates that the homeowner purchased the property in 2002 for the sum of $195,000, and at the time of appraisal—less than two years later—the home was worth $217,000. Thus, this shows a net *increase* in value of 10.5% in less than two years. Indeed, nowhere in the appraisal do the figures $28,644 or 13.2% appear. Furthermore, there is no mention in the appraisal of the garage aside from a photograph attached to the report. Additionally, the report concludes that the home has an average residential view, which is the same designation given to all of the comparable homes referenced in the appraisal. We simply do not understand how the Commission arrived at the conclusion that this appraisal establishes a decline in property value, nor how it concluded that the appraiser determined that the alleged decline was caused by the garage.

The Commission makes much of the fact that the Rices did not introduce their own expert evidence to establish that the garage has not had a negative impact on surrounding land values. But impact on surrounding land values is not an explicit criterion included in the zoning ordinance, and while the Commission may choose to consider it as part of its overall compatibility analysis, the Rices are not required to anticipate that decision and present evidence to prove a negative. As the record stands, there is simply no evidence that the garage had a negative impact on surrounding land values. Because we have concluded that the consideration of the West Autumn developer's intent was improper and that there is not substantial evidence supporting the Commission's determinations that the garage does not maintain the role and character of the surrounding area and that the garage adversely affects property values, we are compelled to conclude that there is not substantial evidence supporting the Commission's determination that the garage is incompatible with surrounding land uses. Additionally, we conclude that the Rices have established their compliance with the compatibility with surrounding land uses zoning criterion as a matter of law.

In sum, we have concluded that the Rices have established their compliance with the zoning criteria at issue of a matter of law. Furthermore, there is not substantial evidence supporting the conclusions that the garage is a "commercial" structure, that the garage presents traffic safety problems, or that the garage is incompatible with surrounding land uses. Thus, the Commission erred in concluding that the Rices failed to meet the zoning ordinance criteria for approval of their Development Plan. It also erred in refusing to approve the Development Plan with respect to the garage and in requiring the Real Estate to comply with the West Auburn restrictive covenants.[7] We commend

7. Inasmuch as we have concluded that there is not substantial evidence supporting the Commission's decision, we need not consider whether the Rices should have been entitled to present an estoppel argument based on the Commission's past behavior and instructions

the trial court for being troubled by the posture and equities of this case and acknowledge that it believed its hands to be tied. But we have determined that the trial court did not arrive at the appropriate result and conclude, therefore, that the trial court erred in affirming the Commission's decision.

We reverse the judgment of the trial court and remand with instructions to remand this cause to the Commission with instructions to approve the Development Plan unconditionally with respect to the home and the garage.

MAY, J., concurs.

SULLIVAN, J., concurs in result with opinion.

SULLIVAN, Judge, concurring in result.

I concur in the reversal of the judgment and in the remand with instructions to approve the Development Plan. I do so, however, because I agree that the Rices established, as a matter of law, each of the criteria required for approval of the application.

I do not join with my colleagues in their discussion which couches the determinative analysis in terms of the sufficiency of the evidence to support the Commission's various conclusions. That is not the proper standard of review as the majority itself observes in the last paragraph of Part I.

to the Rices with respect to the Real Estate. Similarly, we need not consider whether the trial court erred in refusing to consider any

events prior to the filing of the Development Plan.