Michael **LUKIS**, Appellant–Respondent,

v.

Dean **RAY**, John Blackburn, and Thomas Blackburn, Appellees–Petitioners.

No. 76A03–0711–CV–513.

Court of Appeals of Indiana.

June 13, 2008.

Stephen R. Snyder, Randall L. Morgan, Snyder, Birch & Morgan LLP, Syracuse, IN, Attorneys for Appellant.

George G. Martin, Fort Wayne, IN, Attorney for Appellees.

## OPINION

BAKER, Chief Judge.

Appellant-respondent Michael Lukis appeals the trial court's order determining that the way in which the Indiana Natural Resources Commission (NRC) evaluated the parties' respective riparian rights was contrary to law and remanding the matter for reconsideration. Lukis argues that in arriving at that result, the trial court overstepped its authority on judicial review of an administrative action. Finding that the trial court erroneously concluded that the NRC's determination was contrary to law, we reverse.

## FACTS [1]

Lukis and appellees-petitioners Dean Ray, John Blackburn, and Thomas Blackburn (collectively, the appellees) each own lakefront properties on Lake James in Steuben County. Lukis's lot is on the west end of a cove and includes 85.19 feet of lake frontage. The Blackburns' property abuts the eastern boundary of Lukis's lot and includes 29.93 feet of lake frontage. Ray's property abuts the eastern boundary of the Blackburns' property and includes 24.02 feet of lake frontage. None of the lots intersect the lake at right angles and all of the lots are irregularly shaped. The lots belonging to Ray and the Blackburns are included as part of the plat of the First Addition to Gleneyre Beach; consequently, they are subject to the constitution, bylaws, and restrictive covenants of the Gleneyre Association, Inc. Appellant's App. p. 183.

In 2005, Lukis installed a pier that was eighty-nine feet long and twenty-seven feet wide. The pier was located approximately ten feet closer to the Blackburns' west property line than piers installed by Lukis's predecessors had been. As a result of the location and orientation of Lukis's pier, the Blackburns had to relocate their pier thirty feet farther east than it had been in the past, which precluded Ray from accessing the lake from the west side of his pier. Additionally, Ray had to shorten his pier by twenty feet, causing him to experience navigation problems. Ray's

---

1. We heard oral argument in Indianapolis on May 22, 2008. We thank the parties for their excellent oral presentations.

neighbors to the east agreed to allow him to park his pontoon on the east side of his pier, which was within their property lines as extended into the lake, for the 2005 through 2007 lake seasons, but had they refused he would have had no way of accessing the lake. Lukis refused the appellees' requests to decrease the size of his pier or change its orientation.

On May 31, 2005, Ray instituted an action with the NRC, seeking resolution of the pier dispute. The Blackburns, Lukis, and other property owners who did not take part in the eventual trial court proceedings joined the NRC action. Lukis filed a counterclaim against Ray and a cross-claim against the Blackburns and other parties, alleging unreasonable interference with his riparian rights.

On June 8, 2006, the Administrative Law Judge (ALJ) conducted a hearing and issued a non-final order on August 16, 2006, finding in pertinent part as follows:

39. The Grounds Committee of the Gleneyre Association established rules and regulations including a determination that "each lakefront lot owner shall have full riparian rights to the lakefront bounded by the respective property lines extended past the shoreline."

\* \* \*

49 ..... [the appellees] dispute the reasonableness of determining riparian zones by the extension of property lines into Lake James.

\* \* \*

52. While there is "no set rule in Indiana for establishing the extension of boundaries into a lake," [*Rufenbarger v. Lowe*, 9 Caddnar 150, 152 (2004),] two general premises for such determination have emerged. *Id.*

53. "Where a shoreline approximates a straight line and where the onshore property boundaries are perpendicular to the shore, the boundaries are determined by extending the onshore property boundaries" lakeward. *Id.*

54. However, "when the shoreline is irregular, and drawing lines at right angles to the shoreline would not accomplish a just apportionment, the boundary lines should divide the available navigable waterfront in proportion to the amount of shoreline of each owner...." *Id.* [ ]

55. Based upon the evidence presented in the instant proceeding, the shoreline is generally irregular and the parties' onshore property lines are not perpendicular to the shoreline.

56. Therefore, Lukis' *complete* reliance upon the extension of onshore property boundaries lakeward is somewhat misplaced in this particular case.

57. However, the riparian zones determined by extending onshore property lines lakeward appear to accomplish a just apportionment between the respective parties based upon the "amount of shoreline of each owner." *Rufenbarger*, supra.

58. The riparian ... zones clearly establish that Ray possesses the smallest amount of lakeshore ... and in accordance with an apportionment methodology also possesses the smallest riparian zone. The Blackburns' .... shoreline is only slightly longer than Ray's and results in a riparian zone only slightly larger than Ray's. Lukis, who pos-

sess by far the largest expanse of shoreline ..., controls the largest riparian zone of all the parties.

* * *

61. In this particular case, the result of establishing the parties' riparian zones by extending onshore property lines lakeward, equivocates the apportionment of riparian zones consistent with the amount of shoreline owned by each respective owner. [ FN 7]

[FN 7.] The Gleneyre Association, Inc. through its rules and regulations, which are "maintained for the mutual benefit and protection of all owners," has determined that the riparian zones of lakefront owners shall be determined by the "property lines extended." Exhibit I, pg 6. Restrictive covenants of this type should be enforced unless they are ambiguous or violate public policy. *Renfro v. McGuyer,* 799 N.E.2d 544 (Ind.Ct.App.2003). The Gleneyre Association, Inc.'s rules, regulations, restrictions and covenants were not the deciding factor in this proceeding; however, it is noted that those rules and regulations are consistent with the conclusion reached.

62. It is hereby determined that establishing Ray's, Lukis', [and] the Blackburns' ... riparian zones by extending their onshore property lines lakeward is appropriate.

* * *

86. In 2005, Ray was forced to shorten his temporary pier by twenty (20) feet as a result of Lukis installing his newly configured pier and Lukis' refusal to allow the Blackburns' continued encroachment into what Lukis claims as his riparian zone.

* * *

102. As a result of Lukis' temporary pier installation, the Blackburns were forced to relocate their temporary pier.

* * *

116. It is imperative that all of the parties embrace the reality that the old pier configurations, which obligated the Blackburns to encroach upon what is now the Lukis riparian zone in order to allow Ray to encroach upon the Blackburns are no more.

* * *

120. Ray argues that Lukis' temporary pier is unusually wide and long in comparison to other temporary piers located in the vicinity [in violation of 312 IAC 11–3–1(b)(4) ].

121. Evidence provided in this proceeding establishes no exact dimensions associated with any temporary piers ... except for those ... maintained by Lukis, the Blackburns and Ray.

* * *

123. Contrary to Ray's argument, one aerial photograph reveals that the lengths and widths of piers in the area vary greatly.

124. The evidence does not support a determination by a preponderance of the evidence that Lukis' temporary pier is unusually wide or long....

* * *

128. The Blackburns and Ray ..., due to the size and shape of their riparian zones, lack any ability to accommodate their neighbors and only limited ability to improve their own situation.

129. Conversely, ... Lukis [is] ... permitted some flexibility by the size and shape of [his] riparian zone[ ]. As such, Lukis ... who

possess[es] the ability to either impede the remaining parties' access and navigation or improve the situation, must choose the latter.

### FINAL ORDER

130. Riparian zones of the respective parties are determinable by extending their own shore property lines lakeward....

131. Absent a written agreement between impacted parties, each of the parties are obligated to maintain any temporary structure, as well as all appendages to the temporary structure (including watercraft), within their own individual riparian zones.

132  .... [N]o party may place or maintain any temporary structure or any appendage to a temporary structure (including watercraft) within Lake James in a manner that infringes upon another riparian owner's or the public's access to Lake James or that serves as an impediment to navigation.

Appellant's App. p. 29–35 (some footnotes and citations omitted) (emphasis in original). The appellees filed written objections to the nonfinal order and after hearing argument, the Administrative Orders and Procedures Act Committee of the NRC issued a final order fully adopting the ALJ's nonfinal order.

On January 16, 2007, the appellees filed a petition for judicial review. Following a hearing, the trial court entered an order on September 24, 2007, remanding the matter to the NRC. Among other things, the trial court found as follows:

4. Lukis constructed a dock and boatlift. The dock was approximately 89 feet long and was 27 ½ feet wide at the lake end.

5. Historically, the dock of Lukis' predecessors in title was 40 feet long.

6. The difference in water depth from the lake end of a dock extending 40 feet to the lake end of the same dock extending 89 feet is approximately 6 inches.

\* \* \*

26. The case of *Bath v. Courts,* 459 N.E.2d 72 (Ind.App.1984) teaches us that when contiguous lakefront property owners have a dispute regarding their respective riparian rights, if their property boundaries are perpendicular to the shoreline, then it is appropriate in establishing riparian rights to simply extend their respective property boundaries into the lake. The *Bath* court relied upon the opinion of *Nosek v. Stryker,* [103 Wis.2d 633] 309 N.W.2d 868 (Wis.[App.]1981). In the case at bar the respective boundary lines ... do not touch upon Lake James at right angles. Rather, their respective properties sit on a cove.

27. This Court has been unable to find any Indiana case which deals directly with the factual scenario with which it has been presented.

28. The *Nosek* court, however, did set forth a formula for dealing with the factual situation before this Court....

29. When presented with irregular property lines such as in the case at bar the *Nosek* court adopted what it called the "apportionment method" of adjusting disputed riparian rights....

30. By application of the apportionment method ... each lakefront property owner receives a naviga-

ble waterfront proportionate to the width of that property owner's shore line.

31. In the case at bar the ALJ did not apply the apportionment method in developing riparian zones for Lukis, Ray and Blackburn. Rather, the ALJ extended existing property lines into Lake James. By so doing, Ray finds himself in the precarious position of having to rely upon the largesse of [his neighbor] in order to moor his pontoon boat.

32. This Court concludes that the ALJ did not establish riparian zones among Lukis, Ray and Blackburn in accordance with the apportionment method as set forth in *Nosek* ... and, therefore, the decision of the ALJ is contrary to law.

\* \* \*

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. This case is remanded to the [NRC] for further proceedings not inconsistent with the Order of the Court entered this date.

Appellant's App. p. 9–15. Lukis now appeals.

## DISCUSSION AND DECISION

### I.  Standard of Review

■  The manner in which we review the decision of an administrative agency is well established:

In reviewing an agency decision, we may provide relief only if the decision is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. An administrative act is arbitrary and capricious only where it is willful and unreasonable, without consideration and in disregard of the facts and circumstances of the case, or without some basis that would lead a reasonable and honest person to the same conclusion....

*Rice v. Allen County Plan Comm'n*, 852 N.E.2d 591, 597 (Ind.Ct.App.2006) (internal citations omitted). The burden of demonstrating the invalidity of the agency action is on the party asserting invalidity. *Id.*

■  We review questions of law de novo. *Ind. Dep't of Envtl. Mgmt. v. Lake County Solid Waste Mgmt. Dist.*, 847 N.E.2d 974, 983 (Ind.Ct.App.2006). In construing any applicable statute, however, we should defer to the interpretation of the agency charged with the statute's interpretation and enforcement. *Ind. Wholesale Wine & Liquor Co., Inc. v. State*, 695 N.E.2d 99, 105–06 (Ind.1998). We will consider alternative constructions only if the agency's interpretation is unreasonable. *Id.*

### II.  Riparian Rights

■  Lukis argues that the trial court erroneously concluded that the way in which the NRC calculated the parties' respective riparian zones was contrary to law. The appellees disagree, and the parties direct our attention to a number of cases in support of their respective positions. Initially, as a general matter, we observe that a riparian owner acquires his rights to the water from his fee title to the shoreland. *Bath*, 459 N.E.2d at 74. A panel of this court has explained that

[t]he rights associated with riparian ownership generally include: (1) the right of access to navigable water; (2) the right to build a pier out to the line of

navigability; (3) the right to accretions; and (4) the right to a reasonable use of the water for general purposes such as boating, domestic use, etc.

*Parkison v. McCue*, 831 N.E.2d 118, 128 (Ind.Ct.App.2005).

In *Bath*, a panel of this court considered the complaints of neighbors on a lake who disagreed about the proper angle and location of their respective piers. In resolving the dispute, the *Bath* court stated that "[t]here is no set rule in Indiana for establishing the extension of [property] boundaries into a lake between contiguous shoreline properties." 459 N.E.2d at 73. In *Bath*, the shoreline approximated a straight line and the onshore property boundaries were perpendicular to the shore. Thus, the *Bath* court decided that the appropriate way to determine riparian zones was to extend the onshore boundaries into the lake. *Id.* Additionally, the court emphasized that "the riparian right to build a pier is limited by the rights of the public and of other riparian owners. Therefore, riparian owners may build a pier within the extension of [their] shore boundaries only so far out as not to interfere with the use of the lake by others." *Id.* at 76.

In reaching its conclusion, the *Bath* court relied on an opinion of the Wisconsin Supreme Court—*Nosek v. Stryker*, 103 Wis.2d 633, 309 N.W.2d 868 (App.1981). *Nosek* also involved a dispute between contiguous landowners on a lake about the location and size of the landowners' respective piers. In considering how to establish the parties' riparian zones, the *Nosek* court described three possible ways of doing so:

> ... In the least complicated situation, where the course of the shore approximates a straight line and the onshore property division lines are at right angles with the shore, the boundaries are determined by simply extending the onshore property division lines into the lake....

Often, however, the boundary lines on land are not at right angles with the shore but approach the shore at obtuse or acute angles. In such cases, it is inappropriate to apportion the riparian tract by extending the onshore boundaries. Instead, the division lines should be drawn in a straight line at a right angle to the shoreline without respect to the onshore boundaries....

A third method is used where the shoreline is irregular. In that case, if it is impossible to draw lines at right angles to the shore to accomplish a just apportionment, then the boundary line should be run in such a way as to divide the total navigable waterfront in proportion to the length of the actual shorelines of each owner taken according to the general trend of the shore. [ [FN3] ]

[FN3.] This same test is stated another way in [*Thomas v. Ashland, Siskiwit & Iron River Logging Railway*, 122 Wis. 519, 524, 100 N.W. 993, 994 (1904) ], as follows: "[T]he whole cove is to be treated as a unit of the shore line by drawing such perpendicular lines from its two boundary points or headlands to the line of navigability, and then apportioning the whole intervening boundary line of navigable water to the whole shore line of the cove between such headlands, and by drawing straight lines from the two termini of each so apportioned share of navigable water line to the respective termini of the corresponding shore line pertaining to each owner."

*Id.* at 870–72 (some internal citations omitted). The court emphasized that the third method "is only to be applied when the irregularities or curvature of the shore are such that lines cannot be equitably drawn at right angles to the shore." *Id.* at 872. In *Nosek*, although the shoreline was a cove, "the shore directly abutting the properties involved [was] a straight line or

approximate[d] a straight line." *Id.* Consequently, the *Nosek* court applied the first method—straight extension of the onshore boundaries out onto the lake.

The next case discussed by the parties is *Zapffe v. Srbeny*, 587 N.E.2d 177 (Ind.Ct. App.1992), and it also concerns contiguous landowners on a lake whose dispute centered on the location and orientation of a pier and other mooring devices. In considering how to measure the parties' riparian zones, the court turned to *Bath* and explained that "[i]n that case, we recognized that the onshore boundaries of a riparian tract extend into the lake in a line perpendicular to the shore, where the shoreline approximates a straight line." *Id.* at 179. But the *Zapffe* court noted that Bath did not answer the following question: "How far into a lake do the boundaries of a riparian tract extend?" *Id.* In answering that question—the resolution of which is not pertinent to the matter at hand—the court stated that "[i]nstead of a rigid application using a measure of depth or length to determine riparian boundaries, the better view would be to apply a 'reasonableness' test to accommodate the diverse characteristics of Indiana's numerous freshwater lakes." *Id.* at 181. The reasonableness determination "should be decided on the basis of the facts and circumstances of each particular case so that a court can treat each affected riparian owner equitably." *Id.*

Having reviewed the above caselaw, it is apparent to us that the standards contained therein are fluid and best applied on a case-by-case basis. Specifically, the *Bath* court concluded that there is no set rule for establishing the extension of boundaries into a lake between contiguous shoreline properties and the *Zapffe* court applied a nonrigid reasonableness test. The *Nosek* apportionment method would be a perfectly appropriate way to solve the parties' dispute, but this method has never been adopted as a fixed rule in Indiana. Indeed, as we have just concluded, there is no fixed rule governing such disputes. The trial court, therefore, erroneously concluded that the NRC's failure to follow the *Nosek* rule was contrary to law.

In fact, the NRC acknowledged the wisdom of the *Nosek* rule, merely concluding that the extension of boundary lines would accomplish an equally fair result. The NRC acknowledged that the shoreline "is generally irregular and the parties' onshore property lines are not perpendicular to the shoreline" and found that a "complete reliance" on the extension of boundary lines lakeward was "misplaced[.]" Appellant's App. p. 24. The NRC then concluded, however, that, "[i]n this particular case, the result of establishing the parties' riparian zones by extending onshore property lines lakeward, *equivocates the apportionment of riparian zones* consistent with the amount of shoreline owned by each respective owner." *Id.* at 24–25 (emphasis added). Having carefully reviewed the facts and circumstances of the case, the NRC concluded that extending the property lines lakeward was equitable and resulted in a fair apportionment. That there may have been other results that would, likewise, have been equitable does not mean that the NRC arrived at a result that was erroneous or contrary to law. Nothing in the NRC's decision warrants second-guessing from the judicial system.

■ The appellees disagree, describing the "devastating effect" of the NRC's decision. Appellees' Br. p. 15. Specifically, they argue that Ray is at the mercy of his neighbors, who currently permit him to place his lift and boat in a way that slightly encroaches on their riparian zone. They are under no obligation to do so, however, and could refuse to allow him to do so in

the future. Ray notes that "for the first time ever, [he] does not have access to navigable water exclusive of any other owner." *Id.* at 16. Thus, the appellees argue that even if equity is the correct standard to apply, the NRC's decision "missed the boat." *Id.* at 19. Initially, we observe that all riparian owners have the right of access to navigable water. *Parkison,* 831 N.E.2d at 128. To the extent that Ray finds himself with no such access, he is free to institute another action with the NRC to resolve the situation.[2]

Furthermore, we note that the appellees purchased their respective lots pursuant to a homeowner association's constitution and bylaws, which provide, among other things, that "[e]ach lakefront lot owner shall have full riparian rights to the lakefront bounded by the respective property lines extended past the shoreline." Appellant's App. p. 198. For an unexplained reason, the NRC found that this issue was not dispositive. We disagree, inasmuch as a party should not be permitted to assert rights that have already been given away. Here, the appellees agreed that a condition of owning their respective lots was that their riparian zones would be determined by extending their property lines into the lake. Having made such an agreement, they should not have been permitted to argue for a contrary method to calculate their riparian zones.

Finally, the appellees direct our attention to the Indiana Administrative Code, which considers piers and boat lifts to be temporary structures and states that temporary structures may not "infringe on the access of an adjacent landowner to the public freshwater lake" or "be unusually wide or long relative to similar structures within the vicinity on the same public freshwater lake." Ind. Admin. Code tit. 312, r. 11–3–1–(b)(2), –(b)(4). The appellees contend that Lukis's pier infringed on their access to the lake, causing them to have to "drastically reconfigure and shorten their piers and relocate their boats." Appellees' Br. p. 18. Additionally, they argue that his pier is unusually wide and long—more than twice as long and seven times as wide as the pier of his predecessor.[3]

It is apparent that these arguments amount to requests to reweigh the evidence, which our standard of review does not permit. The NRC concluded that based on the scant evidence available to it regarding the length and width of piers in the relevant vicinity, Lukis's pier was not unusually long or wide and did not infringe on the appellees' access to the lake. We will not second-guess that determination.

The judgment of the trial court is reversed.

RILEY, J., and ROBB, J., concur.

---

2. It appears to us from reviewing the record that if Lukis and the Blackburns moved their respective piers westward and pivoted them slightly clockwise, everyone's problems would be solved. We leave that to the NRC's discretion, however, in the event that a future action is initiated.

3. The appellees make a final argument that the NRC decision resulted in an inverse condemnation. Initially, we note that there is no condemning authority named as a party; thus, we could provide no relief for any alleged "taking." Furthermore, the appellees have not alleged that a taking has occurred for which they have sought and not received just compensation. *See* Appellees' Br. p. 27 (acknowledging that they "have not filed an inverse condemnation action"). Thus, we will not address this argument.